

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

MAY 10 2021

ARTHUR JOHNSTON
BY_____ DEPUTY

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**QUINCY D. TAYLOR**                                    **PLAINTIFF**

**VERSUS**                          **CIVIL ACTION NO.: 3: 19-CV-331-CWR-FKB**

**UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**          **DEFENDANT**

### SECOND AMENDED COMPLAINT
Jury Trial Demanded

1.      COMES NOW, Pro Se Plaintiff, Quincy D. Taylor, US Army (Ret.), and files

second amendment to this civil action for equitable relief and for damages for discrimination on the basis

of my sex, sex-and-race, color, and disability and in fostering a hostile environment and retaliation in

violation of my rights granted to me by the United States Constitution, pursuant to Title VII of the Civil

Act of 1964, as amended, 42 U.S.C. §2000 et seq, and pursuant to the Rehabilitation Act of 1973, as

amended, Section 504, 29 U.S.C. §794, 42 U.S.C § 2000d–7.

2.      This court has jurisdiction over the claims in this case pursuant 28 U.S.C. §1331.

Venue is proper under Title 28 U.S.C. §§ 1391 (b).

### II.

### PARTIES

3.      I, Pro Se Plaintiff, Quincy D. Taylor, am an adult, dark skinned, African-American,

male, citizen of the United States, residing at 221 Allstate DR, Jackson, MS 39211.

4.      The University of Mississippi Center (hereinafter, "UMMC") is a state agency. UMMC

may be served with process of this Court by service upon Lynn Fitch, Mississippi Attorney General, via

representing attorney Tommy Whitfield at 660 Lakeland East, Suite 200, Flowood, Mississippi 39232.

### III.

1

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.      All conditions precedent to jurisdiction pursuant to Section 706 of Title VII of the Civil

Rights Act of 1964, as amended, have been complied with by Pro Se Plaintiff to wit: Appropriate charge

of employment discrimination has been filed with the Equal Employment Opportunity Commission, and

Notification of Right to Sue was received from the Equal Employment Opportunity Commission

(hereinafter "EEOC") February 11, 2019.

6.      A complaint was then filed by Pro Se Plaintiff, my person, on the 9th of May 2019.

### IV.

## STATEMENT OF THE FACTS

7.      I, the Plaintiff, CPL Quincy D. Taylor, US Army (Ret.) a dark skinned, African-

American male, began my career with UMMC over eight (8) years ago under the title, End User

Computing Specialist Associate" after being medically discharged from the military with a service-

connected disability, completing my Associates Degree in Network Engineering, and obtaining two (2)

CompTia IT industry standard certifications.

8.      At the time of my unlawful discharge on April 17, 2018, I was assigned to the School

of Health-Related Professions (SHRP, hereinafter) under the title, "Field Support Associate." The

extremely hostile environment perpetuated by the same group of superiors listed in this suit throughout

my tenure, forced me to resign in protest, in opposition to the unlawful discriminatory actions taken

against me. This was as a last-ditch effort to find relief for the overwhelming pressure and exacerbation of

my major depressive disorder with anxiety.

9.      At the time of my hiring, on December 19, 2012, the Defendant required my person, to

submit to a Pre-Placement Medical and Physical Examination of which I complied. Prior to this

examination the Defendant required that I fill out a Medical Examination Questionnaire (hereinafter,

"MEQ").

10.     On this "MEQ" form, I disclosed that I was currently taking Citalopram, (an

anti-depressant typically used to treat major depression) amongst other medications.

2

11.     Also, on this "MEQ" form, I disclosed that I was currently being treated for depression, amongst other chronic illnesses.

12.     Also, on this "MEQ" form, regarding impairments, when instructed to check the boxes, "if I ever had" or "have now," I marked an "X" in the "YES" columns for; "frequent trouble sleeping" and "depression or excessive worry" respectively.

13.     Finally, on this "MEQ" form, highlighting the seriousness of my impairments, although embarrassed, I further disclosed that I had been treated at a mental health facility in 2008.

14.     At the time of the relevant events, the impairments listed on the form were considered, impairments I "have now" and "have a record of."

15.     In addition to the "MEQ" form, I also disclosed my status as a "protected special disabled veteran" in my employee profile in the Defendant's electronic HR system "Lawson." Furthermore, I disclosed my "protected special disabled veteran" status repeatedly on approximately 11 different occasions when applying for open internal positions, during UMMC's electronic application process.

16.     At no time during my employment, did the Defendant or any officers, agents, administrators, supervisors, representatives, or personnel thereof, attempt to engage with me in an interactive process to discuss a reasonable accommodation as required by law, after numerous verbal and written requests.

17.     Between February and March of 2018, I composed and delivered an internal email complaint addressed to Shevalian Ware and Stephen Parnell, to warn Shevalian that her tone and condescending speech made me very uncomfortable and made working with her extremely difficult.

18.     Shevalian would often resort to yelling and make embarrassing remarks in the presence of my co-workers alluding to my perceived mental impairment such as "it's all in YOUR head" or "that's just in YOUR head," the last straw being between February and March of 2018.

19.     I noticed that this sort of treatment began after I had an emotional breakdown due to work

3

related stress in the presence of Shevalian in her office in July of 2013, where I could not control myself from becoming tearful for nearly half an hour, and for this, I sought mental health treatment at the Sonny Montgomery VA Medical Center.

20.     I then expressed my first concern about my excessive assignment in comparison to other similarly situated employees, where I was assigned to absorb the duties of two (2) employees, Hassan Moussa-kadri(deceased) and James White, who were reassigned with lesser duties, Shevalian's response was, "I hate when people come in starting shit," referring to my expressed concern, being that I was a fairly new hire.

21.     This response was shocking, intimidating, and would set the tone at the very outset of my relatively short tenure in the Department of Information Systems at UMMC. From that moment forward, I was very reluctant to express concern for fear of being labeled a complainer, troublemaker, or "shit starter" as Shevalian put it.

22.     Although I had expressed concern about my excessive work assignment, I was written up by Shevalian for poor time management and this adverse action was entered into my employee profile in Lawson, although she could not explain to me the reason for the discipline.

23.     On one occasion in 2013, I asked Shevalian if she could validate my IT work experience for continuing education credit towards my CompTIA, A+ and Security+ certifications. Shevalian's response was, "I'm not ready to get involved in that shit." Subsequently, my certifications expired in 2014 forcing me to start the entire certification process over but was unable to recover.

24.     In November 2014, Shelvalian proceeded to harass me for several days in the middle of the office attempting to persuade me to allow her to take out a life insurance policy on me, in which she had no insurable interest. I respectfully declined several times but she kept persisting.

25.     During April on 2016, in the middle of the office in the presence of many coworkers, while comparing employees to television characters, Shevalian said of me, "Quincy reminds me of Huck, the character from the television series "Scandal" which aired from 2012-2018.

4

26.     Huck's character is described as, "a former B613 operative whose skills include computer hacking, assassination and torture, and is emotionally crippled, socially awkward and broken inside."

27.     It's obvious that I was compared to this particular character because of my prior military service, my current job as a computer technician, and because I appeared broken inside and emotionally crippled.

28.     This is the very essence of discrimination! Formulating opinions about others not based on their merits, but rather, on their membership in a group with the same characteristics.

29.     During February-March of 2018, Stephen, who was my direct manager at the time, joined in on the humiliation asking my co-workers things like, "Did you know Quincy's a drill instructor" "...Quincy ran them off, it's his fault."

30.      I have never professed to have ever been a "Drill Instructor" which is also known as a "Drill Sergeant."

31.     Drill Sergeants have been generally perceived as psychotic, paranoid, overbearing, military recruit trainers with multiple personalities who have been shell-shocked or have PTSD. The term Drill Instructor brings to mind movies such as Full Metal Jacket, Major Pain, and Jar Head to name a few.

32.     During the first quarter of 2013, I was reassigned to report to Stephen Parnell. This reassignment was neither an advancement, promotion nor accommodation.

33.      I was now assigned to assume the role of "Server-Application Support" for several complex departmental applications and everything that entails.

34.     The duties of this role were typically assigned to employees with the title, "Information Technology Support Analyst" or "Business Systems Application Coordinator Analyst," both of which paid a higher salary.

35.     I was assigned to perform these duties in conjunction with my ordinary duties at the entry level position of "End User Comp Spec-Associate."

36.     I was also now responsible for computer moves, adds, and changes, for more than 15 different departments located throughout the main campus as well as the Jackson Medical Mall.

37.     After complaining, Stephen promised that things would not continue this way and to allow some time for management to sort things out.

38.     During the first half of 2014, I was reassigned to report to Russell Donald. This reassignment was neither an advancement, promotion, nor accommodation.

39.     After my previous two managers, Shelvalian and Stephen failed to address my need for accommodation due to my mental impairment, I explicitly requested in writing, of Russell to discuss the improvement of my working conditions.

40.      I emailed Russell a meeting invitation in which I explicitly stated that I would like to discuss "improving my working conditions" because of "physical and mental exhaustion."

41.     I attached to the meeting invitation a list detailing my current work assignment and structured it in such a way, that it was effortless to realize that my work assignment was excessive.

42.     I struggled considerably during this time and I began having more trouble concentrating as I wondered if I had complained once too many times.

43.     I began having more trouble sleeping, thinking, communicating, and focusing.

44.     I was humiliated and embarrassed that I had self-disclosed my mental impairment with management when they ignored it and used it against me.

45.     I now understand why individuals are reluctant to disclose problems with mental health because the stigma is a huge barrier to overcome.

46.     UMMC's mandatory annual compliance training lists ignoring emails and phones calls as acts that contribute to a hostile environment, and advises all employees against it.

47.     If management completed the mandatory annual compliance training, these acts indicate a willful intent to create a hostile environment.

48.     A year passed before finally building the courage to reach out to Russell again about my

6

strenuous assignment after being denied other positions for which I had applied.

49.     I again sent a meeting invitation, listed my entire detailed work assignment and stated, "I would like to discuss the following list with you very soon."

50.     A meeting was then set up a few days later at Russell's Jackson Medical Mall office. In this meeting, Russell refused to discuss reasonable accommodations by informing me that my work assignment would need to be further reviewed prior to any discussion of that sort.

51.     Shortly thereafter, Russell was promoted to Director and failed to follow through in reviewing my work assignment and thus discuss possible accommodations.

52.     As my Director, Russell never again mentioned this work review and proceeded to ignore my subsequent phone calls and would not return voice messages.

53.     These events took place during the late part of 2015, early 2016 whereas, I was left in a jumble of confusion as I was reassigned to report to Stephen once again.

54.     This third reassignment was neither an advancement, promotion nor accommodation although I had applied for several open positions for which I qualified.

55.     Already aware of my previous expressed concerns about my excessive assignment, Stephen acted recklessly with no regard for my welfare, health, or safety, by proceeding to perpetuate my situation by tacking on more responsibility.

56.     After having reached out to each of my three managers to discuss improving my working conditions, one manager now Director, I was led to believe by their actions and inactions, that they were conspiring against me.

57.     I applied for several different assignments outside of these three managers but I was never even considered for an interview although qualified for each assignment.

58.     I felt that my employment was in jeopardy for speaking out and with good reason, having witnessed similar treatment of three other similarly situated, dark skinned, African American male "Field Support" employees who spoke out, (Johnny Perry, Kevin Jackson, and Hassan, Musa Kadri

(deceased)) by this same group of superiors prior to their questionable terminations.

59.      Around August of 2016, I applied for and was finally accepted for a "Field Support Associate" assignment at the School of Health-Related Professions (hereinafter, SHRP).

60.      This assignment was also under the direct management of Stephen Parnell, with Russell Donald as the Director.

61.      I accepted this new assignment because it appeared to be my only opportunity to retain my employment by moving into what seemed to be a more suitable environment for me as it relates to my failing mental health.

62.      There, I expected to be the sole technician supporting that one centralized location, just as Ron Landreth, a white male, had done for several years, except that Ron was paid a higher salary under the title "Information Technology Systems Analyst Associate."

63.      Just prior to applying and accepting the SHRP assignment, I applied to, however, decided not to pursue a questionable "End User Computing Specialist Intermediate" assignment with a very vague job description also under the management of Stephen Parnell.

64.      The salary for this vague assignment was higher than the "Field Support Associate" assignment of which I ultimately accepted, however, there were very few details about the scope of the assignment when I inquired of Stephen, and for that reason I declined to accept it.

65.      This strange new assignment seemed to be a "dead-end" position which I thought would be quickly phased out along with whoever accepted it and this came into fruition.

66.      John Lea, an older white male, who seemed to be experiencing health issues, was assigned this "dead end" position.

67.      John Lea's previous assignment was located at the Jackson Medical Mall office under the title "Disaster Recovery Analyst Senior" and had little to no face-to-face interaction with End Users the majority of his career.

68.      This new assignment would require that John move from the Jackson Medical Mall

8

office, to the Main Campus, and also require that he interact with End Users face-to-face, wherever they may be scattered.

69.     This new assignment would require significantly more physical and mental effort for a person of his age and ability.

70.     The fact that John was assigned this particular assignment completely out of his element was a shock to many familiar with his background and abilities.

71.     Within days after accepting this assignment, John Lea took a medical leave of absence (FMLA) and his employment with UMMC mysteriously ended sometime thereafter.

72.     This "dead end" position was also phased out after John's departure from UMMC.

73.     I composed and sent an email to Russell and Stephen explaining why I chose to pursue the SHRP assignment instead of the "dead end" assignment.

74.     Stephen (white male Manager) and Russell (white male Director) seemed very dismayed that I had chosen the SHRP position over the vague assignment during a private meeting between just the three of us.

75.     Their tone in the meeting made me feel that this would be my final assignment at UMMC and the impending pressure that would commence after accepting the assignment turned out to be overwhelming.

76.     After being placed in my new assignment, I quickly realized that I would be forced to work both my old and new assignments concurrently for an indefinite period of time.

77.     Upon realizing this, I immediately reached out to Rebecca Keifer (white female HR Business Partner), to fix this as quickly as possible, however, she failed to respond to my messages.

78.     At the time of the relevant events, Rebecca held the title, "Human Resource Business Partner" for the Department of Information Systems, but only worked very closely with the managers and Directors.

79.     After following up with Rebecca via email on the very next day with a second non

response it was clear to me that I had been "hung out to dry."

80.     Ron Landreth (white male) applied for an open position for the School of Dentistry, and was hired while I myself, a black male with a known disability, applied for the same position for the School of Dentistry, but was denied.

81.     Prior to being placed in his new position at the School of Dentistry, Ron's current position at SHRP was filled prior to his departure. However, prior to being placed in my new position at SHRP, my current position was left unfilled and remained my responsibility concurrently while in my new position.

82.     Ron held the SHRP position under the title "Information Technology Analyst Associate." However, I was placed in the position at SHRP under a lower paying title, "Field Support Associate" and with more duties.

83.     Ron, while in his SHRP position for several years, was responsible for duties at SHRP and SHRP only. When I was placed in the same SHRP position, I was responsible for duties at SHRP along with other duties scattered throughout the entire campus of UMMC and the Jackson Medical Mall.

84.     My assignment required substantially more physical and mental effort.

85.     These overly strenuous working conditions caused a great amount of stress and mental anguish, especially having previously requested better working conditions due to my excessive assignment and known health issues.

86.     After my departure from SHRP in 2018, Justin Dennis (white male) was hired under the title, "Field Support Associate" and assigned to SHRP as my replacement.

87.     After my departure and Justin's placement at SHRP, working conditions for that position improved significantly there by reverted back as Justin was now only responsible for SHRP only, reverting back to the original scope prior to my tenue there.

88.     The SHRP faculty and staff were also not accustomed to a "black male" working as

"their IT guy."

89.     Rose Willis Williams (black female), who held the title "Operations Manager" at SHRP through several changes of administration, related to me how the change in culture negatively impacted African American men at SHRP.

90.     Upon my placement at SHRP, Rose informed me that because of my race and sex (black male), I would need to work ten times as hard as Ron (white male), who I was replacing, in order to have any respect at SHRP due to the culture of discrimination.

91.     My "other duties" consisted of my former "End User Computing Specialist" assignment duties, which at that time, encompassed 14 different departments and at least 3 software applications of which I was the sole Administrator.

92.     For the sake of my conscience and commitment to business continuity, under a substantial amount of stress to provide for my family, I attempted to perform these "other duties" in conjunction with learning and performing my new duties at SHRP.

93.     Not only was this physically exhausting, it was extremely disheartening to me because I had requested to discuss some sort of relief or accommodation from the same assignment that I was being made to work now in conjunction with my new assignment.

94.     I have yet to recover from the effects of this willfully reckless, unlawful treatment and feel that I will never be able to sustain substantially gainful employment again for fear and anxiety of losing my mind, negatively impacting my entire family as a result.

95.     I felt I was being pressured to quit after I spoke out about being mistreated. I was given an overwhelming assignment and was repeatedly ignored by HR and Management after speaking out.

96.     I sought behind the scenes help from mental health professionals and tried my best to continue working, however, my social and family life was severely impacted because of the multitude of symptoms from exacerbation of my major depression, anxiety, and insomnia.

11

97.     During this time, I was prescribed a number of different combinations of medications for my depression, anxiety and a sleeping disorder including; "Citalopram," "Prozac," and "Ambien." I would also attend therapy sessions once per week which too seemed to become more of a burden and physically overwhelming due to my physical and mental exhaustion.

98.     The final straw, was around March 16, 2018, when I applied for a "Field Support Intermediate" assignment requisition number 1601159. This was another attempt to pursue "better working conditions" as my previous complaints about my current working conditions to management and HR went unreciprocated.

99.     The three candidates who applied for this assignment were; William Smith, (dark-skinned African American male) myself, (dark skinned African American male with disability) and Marcella Fleming, (bright skinned, African American female).

100.    Out of the three candidates, I myself had the most experience in Field Support, with approximately 5 years. Will Smith and Marcella Fleming both had approximately 2 years of experience at UMMC respectively.

101.    Marcella was ultimately selected and accepted this position. While in times past, the candidate with seniority or more experience was selected for advancement upon applying and navigating the interview processes.

102.    It became more evident that African American, dark skinned males, received disparate treatment in regard to compensation, terms, conditions, privileges of employment, hiring, firing and promotion because of their race and sex as well as color.

103.    Will, myself and several other coworkers who witnessed this unfold felt very strongly that we were disadvantaged because of our race, color, sex and for the same reasons we did not have an equal opportunity to curry favor with interview panel leading up to the job posting.

104.    The interview panel consisted of three Field Support Managers; Stephen Parnell, Shevalian Ware, and Alex Wilson.

105.    Throughout my tenue at UMMC I worked under the guise of the job duties and title, "End User Computer Specialist – Associate" and "Field Support – Associate," while I actually performed the job duties of an "IT Support Analyst," "Business Systems-App Coordinator Analyst," and "Systems Administrator."

106.    Although under the guise of dissimilar "official titles and job duties," at the time of the relevant events, employees' "actual job duties" under the titles; "End User Computer Specialist," "Field Support," and "IT Support Analyst," were interchangeable.

107.    Employees under these three titles were recognized as one group, "Field Support." Also, employees under the same three titles are similarly situated under a team of three interchangeable managers who all hold the same title, "Manager – Field Support."

108.    Although I applied for several of those higher paying positions on different occasions, I was either disqualified for the requisition, the requisition was canceled, or the requisition was filled. As a dark-skin toned black male with disability, I was not considered for an interview for either of those positions which are primarily held by white males with no apparent disability.

109.    Throughout my tenue at UMMC, I was assigned as the primary support person responsible for onboarding, upgrading, and supporting several enterprise and departmental application/client/server/test environments, in conjunction with normal job duties; while other similar situated employees were not assigned to perform these other job functions.

110.    Furthermore, employees with the title, "Business Systems-App Coordinator Analyst," and "System Administrator," did not have to perform the duties of an "End User Computer Specialist," "Field Support" nor "IT Support Analyst," in conjunction with their normal job functions and were compensated substantially more for performing their normal duties.

111.    I was in fear that because of speaking out against mistreatment, I had needlessly been subjected to a systematic campaign to end my employment, due to the University of Mississippi Medical Center failure to take reasonable and practicable steps and/or implement any 'preventative or protective

measures to ensure a working environment free from hostility and harassment by failing to hold accountable, or failing to train those who fail to comply with written policy, as well as federal and state laws that govern the employment practices in question.

112.    All of the events incorporated from paragraph 1 through 111, culminated in my resignation, which was done in protest of unlawful discrimination against me by my employer on the basis of my race, sex, race and sex, color and disability.

113.    I rescinded my resignation on April 16, 2018, upon a contingent offer from my then manager, Stephen Parnell, to discuss a reasonable accommodation, to address my equal pay concerns, and to address my concerns about discrimination on the basis of my race, sex, color, and disability.

114.    On the very next day, April, 17, 2018, shortly after requesting Stephen to summarize our agreement via email, I received an email from Stephen Parnell now stating that the recension of my resignation would not be considered, effectively terminating my employment.

115.    After receiving this email, I requested to appeal that decision based on the agreement I made with Stephen on the April 16th in reference to discussing accommodations and other concerns.

116.    I made a good faith effort to retain my employment, by airing my grievances however, I was informed by Rebecca Keifer (HR Business Partner), that an appeal was not possible.

117.    I perceived this as a pretext for retaliation because of my speaking out to management and asserting my rights to be free form employment discrimination.

118.    In this series of emails, I was also informed by Russell Donald (Director), that the decision was made by leadership to not retain my employment, citing that "I wanted to negotiate my current position" (discuss a reasonable accommodation) and that, I made an "impulsive" decision to resign. In effect, my employment was terminated because I engaged in a "protected activity" by resigning in protest of the unlawful, discriminatory actions taken against me.

From: Russell G. Donald
Sent: Wednesday, April 18, 2018 1:58 PM
To: Quincy D. Taylor <qtaylor@umc.edu>
Cc: Kevin Yearick <kyearick@umc.edu>; Paul Veregge <paul.veregge@umc.edu>; Rebecca A. Keefer
<rkeefer@umc.edu>; Stephen M. Parnell <sparnell@umc.edu>
Subject: FW: Opportunities

Quincy,

I have reviewed your resignation letter with other leaders in DIS. We have taken note that the situation around the
resignation was based on the fact that Stephen contacted you to discuss a position that you were interviewed where
another candidate was selected. Shortly after the discussion, your letter of resignation was received. The timing of these
two events leads us to believe your action was impulsive and an attempt to negotiate your current position. Based on
this information, DIS leadership have decided to accept your resignation and ask that you finalize it through your Lawson
portal as required by HR. We currently show that your last day will be Friday April the 27th of 2018 as written in the
letter you provided.

Thanks

Russell Donald

Director of IT Service Delivery
Division of Information Systems
University of Mississippi Medical Center
Work 601-984-6398
Cell 601-540-7417
Rdonald@umc.edu

119.    My "impulsive" decision to resign, in protest of discriminatory actions against me, can

also be attributed to the effects of exacerbation of my mental impairment (depression and anxiety), caused

by the culmination of perceived discriminatory actions taken against me by the University of Mississippi

Medical Center, within 180 days and subsequent to 180 days of my filing a charge of discrimination with

the Equal Opportunity Commission on May 2, 2018.

120.    Throughout my tenure at UMMC, I was continually subjected to discriminatory actions,

belittlement, yelling, cursing, embarrassment, harassment, retaliation, and humiliation due to my race and

sex, disability, race, sex, and color, respectively, by the same group of superiors, Shevalian Ware (bright

skinned, African American female), Russell Donald (white male), and Stephen Parnell (white male).

121.    As a result of Defendant's conduct which was willful and malicious, I sustained

damages and losses, including, but not limited to, conscience suffering, emotional distress,

psychological distress, mental anguish, humiliation, embarrassment, loss of past and future

income, loss of past and future wage-earning capacity, loss of benefits, loss of reputation,

pain, suffering and other damages.

## CLAIMS FOR RELEIF

## V.

## COUNT I – VIOLATION OF THE REHABILITATION ACT OF 1973, AS AMENDED

122.    I, the Plaintiff, incorporate the allegations of paragraphs 1 through 121 as if fully recited herein.

123.    The Defendant is an entity that accepts federal funding pursuant Section 504 and is a covered entity for purposes of § 504 of the Rehabilitation Act.

124.    At all times, I was an employee of UMMC which employs the requisite number of employees (over 15) and meets the definition of "employer."

125.    As such, the Defendant, the "employer," is prohibited from discriminating against any "qualified individual with a disability" in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

126.    The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections related to employment.

127.    I, the Plaintiff, the "employee," was at all times pertinent hereto, a "qualified individual" with a disability. Specifically, I was qualified to perform the essential functions required of a field support associate, with or without a reasonable accommodation.

128.    Plaintiff's particular disability is major depression, anxiety, and insomnia which substantially limits one or more of my major life activities and/or major bodily functions.

129.    The Defendant knew or should have known of my disability and/or impairments and of my requests for a reasonable accommodation.

130.    The Defendant violated section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by discriminating against Me, on the basis of disability. Specifically, by not making a reasonable accommodation, and by not making a "good faith" effort to engage with ME in an interactive process to discuss a reasonable accommodation (42 U.S.C. 12112, 42 U.S.C. 1981a). Plaintiff could have been reasonably accommodated but for the Defendant's lack of good faith.

131.     As a result of the Defendant's unlawful actions and/or inactions, I have suffered damages and continue to suffer including but not limited to the loss of past and future wages and benefits, loss of professional opportunities, loss of enjoyment of life, embarrassment, humiliation, low self-esteem, emotional distress, mental pain, and mental anguish.

132.     Plaintiff is entitled to attorneys' fees and costs incurred in this matter pursuant to 29 U.S.C. § 794a.

133.     Plaintiff is further entitled to any and all relief permitted under the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq., including equitable relief.

**VI.**

## COUNT II – HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE REHABILITATION ACT OF 1973, AS AMENDED

134.     I, the Plaintiff, incorporate the allegations of paragraphs 1 through 133 as if fully recited herein.

135.     I, the Plaintiff, a member of a protected class (qualified individual with disability), was consistently and purposefully subjected to unwelcome harassment by my supervisors on the basis of my disability in violation of the Rehabilitation Act of 1973. Specifically, I had to endure insults, mockery, offensive remarks, belittlement, and jokes in reference to my "disabled veteran" status and/or requests for accommodation.

136.     This harassment affected a term, conditions, and/or privileges of my employment by limiting, segregating, or classifying Me in a way that adversely affected the opportunities or status of Me because of my perceived disability, crazy veteran, or "drill sergeant" status. As a result, I was not considered for any open positions of which I applied outside of the group of Field Support managers who perpetuated the harassment.

137.     Defendant knew or should have known of the discriminatory conduct against Me.

138.     Defendant failed to effectively address and correct the disability harassment against Me by staff, employees, agents, and/or personnel of UMMC, resulting in the creation of a hostile work environment.

139.    The Defendant, failed to provide a safe and non-hostile work environment as compared to a non-disabled worker, such failures as noted above, have together and separately, contributed to violating my rights pursuant to Section 504, and the federal rules and regulations promulgated pursuant thereto.

140.    As a direct and proximate result of Defendants' actions, I suffered and continue to suffer damages which include conscience suffering, emotional distress, psychological distress, mental anguish, humiliation, embarrassment, loss of past and future income and/or wage loss, loss of past and future wage-earning capacity, loss of opportunity, loss of benefits, loss of reputation, pain, suffering and other damages and injuries.

**VII.**

## COUNT III – RETALIATION IN VIOLATION OF THE REHABILITATION ACT OF 1973, AS AMENDED

141.    I, the Plaintiff, incorporate the allegations of paragraphs 1 through 140 as if fully recited herein.

142.    After making my work more difficult and increasing scrutiny, Defendant wrongfully and intentionally discharged Me in retaliation for my communicating with my managers about employment discrimination, including harassment and was in deliberate indifference to my rights.

143.    Defendant's retaliatory conduct denied me the opportunity to remain gainfully employed on the basis of having complained of disability discrimination. Specifically, the facts surrounding the allegations of paragraph 112 through 119.

144.    As a direct and proximate result of Defendants' actions, I suffered and continue to suffer damages which include conscience suffering, emotional distress, psychological distress, mental anguish, humiliation, embarrassment, loss of past and future income and/or wage loss, loss of past and future wage-earning capacity, loss of opportunity, loss of benefits, loss of reputation, pain, suffering and other damages and injuries. I will, in all likelihood and for the balance of my life, continue to suffer mental anguish.

145.    Defendant violated my civil rights with malice or reckless indifference to my federally-

protected rights. As such, Plaintiff is entitled to punitive damages in an amount to be determined at

inquest and at the maximum rate permitted by law.

**VIII.**

**COUNT IV – DISCRIMINATION OF THE BASIS OF SEX AND RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED ("TITLE VII")**

146.    I, the Plaintiff, incorporate the allegations of paragraphs 1 through 145 as if fully recited herein.

147.    Defendants owed a duty to Me, a member of the protected class (black male), not to discriminate against me on the basis of my sex and race in violation of Title VII.

148.    Defendant engaged in a pattern and practice of discrimination against Plaintiff on the basis of sex and race in violation of Title VII by subjecting Plaintiff to disparate treatment as set forth above, which included discriminatory terms and conditions of employment.

149.    As a direct result of Defendant's sex and race discrimination against Plaintiff, Plaintiff has lost past and future wages and other employment benefits, and has suffered damage to my reputation, and other incidental and consequential damages and expenses.

150.    Defendant's conduct was outrageous, was done in a deliberate and malicious manner intended to injure Plaintiff, and was done in conscious disregard of Plaintiff's rights. Therefore. Plaintiff is entitled to an award of punitive damages.

**IX.**

**COUNT V – DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED ("TITLE VII")**

151.    I, the Plaintiff, incorporate the allegations of paragraphs 1 through 150 as if fully recited herein.

152.    Defendants owed a duty to Me, a member of the protected class (male), not to discriminate against me on the basis of my sex in violation of Title VII.

153.    Defendant engaged in a pattern and practice of discrimination against Plaintiff on the basis of sex in violation of Title VII by subjecting Plaintiff to disparate treatment as set forth above, which included discriminatory terms and conditions of employment.

154.    As a direct result of Defendant's sex discrimination against Plaintiff, Plaintiff has lost past and future wages and other employment benefits, and has suffered damage to my reputation,

and other incidental and consequential damages and expenses.

155.    Defendant's conduct was outrageous, was done in a deliberate and malicious manner intended to injure Plaintiff, and was done in conscious disregard of Plaintiff's rights. Therefore. Plaintiff is entitled to an award of punitive damages.

**X.**

**COUNT VI – DISCRIMINATION ON THE BASIS OF COLOR IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED ("TITLE VII")**

156.    I, the Plaintiff, incorporate the allegations of paragraphs 1 through 155 as if fully recited herein.

157.    Defendants owed a duty to Me, a member of the protected class (black/dark color), not to discriminate against me on the basis of my color in violation of Title VII.

158.    Defendant engaged in a pattern and practice of discrimination against Plaintiff on the basis of color in violation of Title VII by subjecting Plaintiff to disparate treatment as set forth above, which included discriminatory terms and conditions of employment.

159.    As a direct result of Defendant's color discrimination against Plaintiff, Plaintiff has lost past and future wages and other employment benefits, and has suffered damage to my reputation, and other incidental and consequential damages and expenses.

160.    Defendant's conduct was outrageous, was done in a deliberate and malicious manner intended to injure Plaintiff, and was done in conscious disregard of Plaintiff's rights. Therefore. Plaintiff is entitled to an award of punitive damages.

**XI.**

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands a trial by jury and prays for Judgment in favor of Plaintiff against the Defendant and award of the following relief:

a.    Actual, compensatory and incidental damages in the amount of One Million Dollars ($1,000,000.00) for the embarrassment, humiliation, harassment, mental anguish and severe emotional distress, I suffer and continue to suffer as a direct and proximate result of the conduct of the Defendant described hereinabove;

20

b.  Fringe benefits that have incurred since the Defendant's discrimination;

c.  Compensatory damages in the form of emotional distress, pain, suffering, inconvenience,

mental anguish and other non-pecuniary losses; and

d. I also seek any attorneys' fees and any and all costs associated with this

lawsuit.

e. Defendants actions set forth hereinabove constitute a willful wanton and reckless

disregard for my rights to be free from discrimination and retaliation in

employment. I am further entitled to recover liquidated and punitive

damages in an amount to be set by the trier of fact.

f. I also seek such other and further relief as the Court and Jury may deem.


**RESPECTFULLY SUBMITTED,** this 10th day of May 2021


**By: Quincy D. Taylor**

Pro Se Plaintiff